UNITED STATES OF AMERICA,

          Plaintiff,

v.                       Case No. **19-CR-235**

MICHAEL C. SIEGEL and     [18 U.S.C. §§ 371, 1001, and 1952]
SCOTT D. HOEFT,

          Defendants.

## INDICTMENT

### COUNT ONE
### (Conspiracy)

**THE GRAND JURY CHARGES THAT:**

1. Beginning by 2009, and continuing through at least November 6, 2018, in the State and Eastern District of Wisconsin and elsewhere,

**MICHAEL C. SIEGEL and
SCOTT D. HOEFT**

knowingly conspired with each other and with others known and unknown to the grand jury to use facilities in interstate commerce to promote, manage, carry on, and facilitate the promotion, management, and carrying on of unlawful activity, namely prostitution offenses prohibited by Wisconsin Statutes 944.30 through 944.34, in violation of Title 18, United States Code, Section 1952(a)(3).

### Background

2. Unless otherwise noted, at all times relevant to this indictment:

1

a. Michael C. Siegel operated and held an ownership interest in the "Hardware Store," a strip club located in Clyman, Wisconsin.

b. Until on or about September 28, 2018, Scott D. Hoeft was employed by the Hardware Store as a bartender and a manager.

c. The Hardware Store offered customers the opportunity to purchase lap dances, which generally took place in a room separated from the bar area by a beaded curtain.

d. The Hardware Store offered customers the opportunity to pay a fee to use the club's "champagne rooms" for a specified time period for private dances.

### Purpose of the Conspiracy

3. The primary purpose of the conspiracy was to generate revenue for the Hardware Store by making the club's lap dance and champagne rooms available for unlawful prostitution activity, including oral sex, full intercourse, and fetish activities.

### Manner and Means

4. To achieve the purpose of the conspiracy:

a. The conspirators made the club's lap dance room and champagne rooms available for commercial sexual activity.

b. The conspirators hired and employed dancers willing to perform sex acts, often referred to as "extras," in the club.

c. The conspirators hired and employed dancers working for pimps.

d. The conspirators sent text messages in interstate commerce and used Facebook Messenger, a messaging application and online platform, to communicate with dancers and pimps.

e. The conspirators allowed customers to use credit cards to pay for lap dances and champagne rooms and to obtain cash back to pay dancers directly for sex acts.

### Acts in Furtherance

5. To further the conspiracy, the conspirators committed acts in the Eastern District of Wisconsin and elsewhere, including:

2

a. Between approximately 2009 and September 28, 2018, Siegel, Hoeft, and others hired dancers who were willing to engage in acts of prostitution.

b. Between approximately 2009 and April 12, 2018, Siegel caused condom machines to be made available in the club's restrooms.

c. Between approximately 2009 and November 6, 2018, Siegel, Hoeft, and others caused a daily record to be kept of the number of lap dances and champagne rooms each dancer had performed.

d. On or about August 13, 2015, J.C., a dancer working for a pimp named Christopher Childs, communicated with Siegel using Facebook Messenger. J.C. explained that although Childs already had talked to Hoeft, J.C. wanted to make sure that Siegel approved of her working at the club. Siegel responded that J.C. was "part of the hardware store family."

e. Between September 3, 2015, and July 17, 2016, Hoeft and another conspirator exchanged Facebook messages with J.C. about her schedule and the schedule of another woman working for Childs.

f. On or about July 29, 2016, a conspirator sent J.C. a Facebook message asking if J.C. recalled Siegel setting her up with a particular commercial sex customer and asking whether J.C. could work on July 30, 2016, because Siegel needed a "reliable pretty girl" for a different commercial sex customer.

g. On or about July 30, 2016, J.C. sent a Facebook message to Siegel to explain that she was running late, and Siegel replied that the clients were waiting for J.C.

h. On or about August 29, 2016, Siegel exchanged Facebook messages with J.C. regarding a dispute over the number of champagne rooms she had performed the prior evening. Immediately after the exchange, another conspirator sent Childs a message asking that he call Siegel.

i. In February 2016, a conspirator employed by the Hardware Store sent Facebook messages to Childs asking about the schedule of a woman for whom Childs served as a pimp.

j. On or about November 13, 2016, a conspirator employed by the Hardware Store sent a Facebook message to Childs to advise that J.C. had money waiting at the club.

k. Between approximately November 2016 and May 14, 2017, Hoeft exchanged messages with Childs regarding how many champagne rooms women working for Childs had performed during their shifts and whether they had been following Childs' rules.

l.  Between on or about February 14, 2017, and February 16, 2017, Childs exchanged Facebook messages with a conspirator employed by the Hardware Store regarding whether one of the women for whom he served as a pimp had been using drugs.

m.  On or about February 27, 2017, Siegel called a woman for whom Childs served as a pimp to discuss her schedule.

n.  In May 2017, Siegel told J.C. that although he was willing to grant Childs' request to prevent a particular dancer from working at the club, Siegel wanted Childs to call him directly to discuss the matter.

o.  On or about December 20, 2017, following an incident involving an act of prostitution taking place in one of the club's champagne rooms, Siegel provided false information to law enforcement, claiming that the Hardware Store fired any dancer suspected of engaging in sexual activity.

p.  On or about January 19, 2018, Hoeft exchanged text messages with Childs regarding how "Chrissy," a woman working for Childs, was performing.

q.  On or about January 20, 2018, Siegel and another conspirator exchanged messages regarding the fact that Childs was "Chrissy's" pimp.

r.  On or about February 1, 2018, Hoeft texted Childs to ask whether "Chrissy" could work at another strip club operated by Siegel.

s.  On or about April 12, 2018, Siegel provided false information to law enforcement, claiming that he had no idea that Childs was a pimp.

t.  On or about September 28, 2018, following an incident in which law enforcement observed a dancer performing oral sex in the lap dance area, Siegel provided false information to law enforcement regarding the club's policies, practices, and procedures.

u.  On or about November 4, 2018, following execution of a federal search warrant at the Hardware Store, Siegel instructed another conspirator to call in women to work at the club upon reeopening who did not perform "extras."

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNT TWO
## (False Statements)

**THE GRAND JURY FURTHER CHARGES THAT:**

1. On or about April 12, 2018, in the State and Eastern District of Wisconsin, while meeting with a special agent of the United States Department of Labor, Office of Inspector General, and a detective employed by the Dodge County Sheriff's Office,

**MICHAEL C. SIEGEL**

knowingly made false statements in a matter within the jurisdiction of the Executive Branch of the Government of the United States.

2. The statements were that Siegel had no idea that Christopher Childs was a pimp and that Childs had no business relationship with the Hardware Store, a strip club operated by Siegel.

3. At the time he made the statements, Siegel knew that Childs was a pimp and had communicated with and caused others to communicate with Childs regarding the schedules, conduct, and earnings of women for whom Childs served as a pimp.

4. Siegel's statements were material to an ongoing federal investigation of human trafficking and related offenses taking place at the Hardware Store.

All in violation of Title 18, United States Code, Section 1001.

## FORFEITURE NOTICE

1. Upon conviction of the offense of conspiracy to use facilities in interstate commerce to promote, manage, carry on, and facilitate the promotion, management, and carrying on of unlawful activity, namely prostitution offenses prohibited by Wisconsin Statutes 944.30 through 944.34, and by Title 18, United States Code, Section 1952(a)(3), all in violation of Title 18, United States Code, Section 371, as set forth in Count One of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses. The property to be forfeited includes, but is not limited to, a sum of money equal to the proceeds derived from the offense.

2. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL:

FOREPERSON
Dated: 12-10-19

MATTHEW D. KRUEGER
United States Attorney

6
Case 2:19-cr-00235-PP   Filed 12/10/19   Page 6 of 6   Document 1